# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 30, 2003 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. A.N.G. and S.L.G.

**Appeal from the Juvenile Court for Greene County**
**No. 15382    Thomas J. Wright, Judge**

**FILED FEBRUARY 26, 2003**

**No. E2002-01114-COA-R3-JV**

---

The State of Tennessee, Department of Children's Services ("State" or "DCS") obtained temporary custody of the three minor children of A.N.G. ("Mother") and S.L.G. ("Father")(collectively referred to as "Parents") after Parents' two year old son was found in a roadway near their home. DCS later sought to terminate Parents' parental rights. After a trial, the Juvenile Court determined there were sufficient grounds to terminate Parents' parental rights and doing so was in the best interests of the children. Parents appeal, claiming DCS failed to prove by clear and convincing evidence that there were sufficient grounds to terminate their parental rights. Parents also claim DCS failed to prove by clear and convincing evidence that termination of their parental rights would be in the best interests of the children. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of
the Juvenile Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Douglas L. Payne, Greeneville, Tennessee, for the Appellant A.N.G.

David L. Leonard, Greeneville, Tennessee, for the Appellant S.L.G.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

**OPINION**

## Background

This litigation began with a Petition for Temporary Custody filed by DCS on August 31, 1999. In this petition, DCS alleged Parents' two year old daughter had been left alone in an apartment for almost four hours before Parents could be located. The child apparently was found wandering around the apartment complex. DCS alleged the child was subjected to an immediate threat to her safety and a delay in having a hearing would result in severe or irreparable harm. DCS also alleged it was in the child's best interests to be removed from Parents' custody. The Juvenile Court, due to the emergency nature of the situation, placed the child in DCS custody. On September 1, 1999, a hearing was held concerning the allegations contained in the petition. Parents and the guardian ad litem testified at the hearing. Based on this testimony, which is not contained in the record on appeal, the Juvenile Court restored custody of the child to Parents.

In April of 2001, another Petition for Temporary Custody was filed.[1] DCS alleged all three of Parents' children were dependent and neglected. DCS alleged Parents were incarcerated for criminal charges related to their neglect of the children. Specifically, Parents were arrested when their two year old son was found in a roadway near their home. According to DCS, the other two children were with Mother who was passed out. The location of Father was unknown. DCS alleged the children were subjected to an immediate threat to their safety and a delay in having a hearing would result in severe or irreparable harm. DCS also alleged it was in the children's best interests to be removed from Parents' custody. The Juvenile Court granted temporary custody to DCS and set the matter for hearing. The children's paternal grandmother then filed a petition seeking custody of the children. On May 23, 2001, the Juvenile Court conducted another hearing and determined the children were dependent and neglected. DCS was awarded temporary custody and physical custody was placed with the children's paternal grandmother. Parents were, however, allowed supervised visitations and both were ordered to pay a set amount of child support.

In May of 2001, a Permanency Plan ("Plan") was developed with the stated goal being the return of the children to Parents. Under the terms of the Plan, Parents were to find employment sufficient to provide for all three children. Parents also were to complete parenting classes as well as demonstrate they were not abusing alcohol or drugs. These and other requirements were explained to Parents. Parents acknowledged in writing their agreement with the terms of the Plan.

In November of 2001, DCS petitioned Juvenile Court to terminate Parents' parental rights for numerous reasons. DCS alleged: 1) the children had been removed from the home for at least six months and the conditions which led to their removal persisted; 2) there was little likelihood

---

[1] The first Petition for Temporary Custody involved only Parents' two year old daughter, although Parents also had a son who was ten months old at that time. A third child, another son, was born in June of 2000. In the second Petition for Temporary Custody, DCS sought temporary custody of all three children.

that these conditions would be remedied at an early date which would permit a safe return of the children to the home; and 3) continuation of the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home. DCS also alleged there had not been substantial compliance by Parents with the Plan, and that Parents had willfully abandoned their children by not paying child support and by failing to visit the children for more than four consecutive months preceding the filing of the petition. Finally, DCS alleged it would be in the best interests of the children for Parents' parental rights to be terminated.

A trial was conducted on March 13, 2002. The first witness was Lana Justis ("Justis"), the DCS case manager assigned to the case since April of 2001. Justis testified the children came into the State's custody after the middle child was found wandering around naked in a convenience store parking lot. The police entered Parents' home and found Mother asleep and the other two children unattended. When Father returned, Parents were arrested. Thereafter, Justis developed the Plan and went over the contents of the Plan with Parents, which they signed. Justis testified the Plan required Parents to complete parenting classes successfully. While Mother completed such a class, Justis was not aware of Father's complying with this requirement.[2] The Plan also required Parents to obtain suitable employment to support the children. At the time of trial, Parents had separated. Mother was not employed. Justis did not know whether Father was employed. Another requirement in the Plan was for Parents to provide a suitable babysitter to care for the children while Parents were at work. When Justis performed a home interview of Mother, Mother was working third shift at Waffle House and "did not know what to do with any of the children while she was at work or while she was asleep." Justis was unaware of any steps Father had taken in this regard. Father moved to Morristown and had several different residences. Justis was unable to maintain contact with Father. Parents also were required to demonstrate they were not abusing drugs and alcohol and to submit to drug tests. Because she did not know where Father was and Mother did not have a telephone, Justis was unable to administer drug tests. A drug test was administered the day of trial. Mother tested negative for drugs. Father tested positive for THC. Justis stated that after the Plan was developed, issues arose with regard to suitable housing and transportation. At the time of trial, Mother's car was not functional and, to her knowledge, Father did not have transportation. Mother had obtained an apartment suitable for the children. Justis asked Mother to keep in touch with her at least twice a month, but Mother had not done so. When asked what conditions would cause further abuse or neglect and prevent the safe return of the children, Justis responded: "[Mother] has no transportation. She has no employment. She has provided very little documentation to the Department about her interest in her children. Her visits have been sporadic, especially since the last court hearing."

Based on documentation provided by the children's grandmother, from November 30, 2001, through March 13, 2002, Mother visited the children four times. More specifically, Mother visited the children for 20 minutes on November 30, four hours on December 14, two and one-half hours on January 25, and two and one half hours on March 2. According to Justis, Father

---

[2] It appears Father did complete a class titled The Effects of Divorce on Children. The record is unclear whether this class met the requirements of a parenting class.

visited the children for thirty minutes on November 30, one hour on December 13, four hours on December 14, four hours on December 21, three hours on December 25, thirty minutes on January 14, thirty minutes on January 24, two hours on February 22, and two hours on March 8.

It was alleged in the Petition to Terminate Parental Rights that Parents failed to pay child support for four consecutive months prior to the filing of the Petition. Justis acknowledged that Father had paid some child support, but not the amount required in the Juvenile Court's order. At the last court hearing before trial, Father was approximately $400 in arrears and Mother was approximately $1,000 in arrears. One month prior to trial, Justis contacted the court clerk's office and was told nothing had been received from Parents since the last court date. At the time of trial, Mother was approximately $1,640 in arrears and Father was $1,000 in arrears. Justis was not aware of Parents paying any child support from the last court hearing up to the date of trial. When asked if she knew exactly what monies Father had paid in the four months preceding the filing of the Petition, Justis said she did not know but that information had been presented at the last court hearing. When asked if she had documentation showing Father's visits with the children in the four months preceding the filing of the Petition, Justis stated her copy of this information was "submitted to the file" and the children's grandmother had this information.

Justis further testified she received a call from Father on July 7 wherein Father stated he was going to parenting classes, but he did not have a car and had been laid off from his job. Father also stated he was living with a cousin and could not have the children stay with him at that time. Apparently, Father had attended a class through the probation department, but Justis claimed the Juvenile Court had determined previously that this was not the type of class Father needed to take. With regard to Mother's employment over the previous year, Justis testified she was told by Mother that she had worked at a Raceway Market but was fired for stealing, an allegation which Mother denies. Mother also worked at a tattoo parlor, but she received two piercings instead of wages.

Ms. Nancy Hensley, the children's paternal grandmother ("Grandmother") was called as a witness. Grandmother kept a log of the visits and telephone calls of Parents. Grandmother testified that between May 24 and November 28 of 2001, both Mother and Father visited the children a total of eleven times. From November 28, 2001 through March 13, 2002, Grandmother received no child support from either Parent. Mother and Father did not send the children Christmas or birthday presents and did not give them any cards. Grandmother described Parents' visits with the children as positive. The children were excited to see Mother and Father. Grandmother and her husband had attended parenting classes and Grandmother wanted to adopt the children if Mother and Father's parental rights were terminated. Grandmother testified that if she adopted the children, she intended on allowing Mother and Father to maintain contact with their children. The record establishes that Grandmother's residence is suitable for taking care of the three children.

Mother testified she currently resides at Manor Apartments. According to Mother, she successfully completed a parenting class. Mother testified she had worked at Waffle House for four months with that job ending about one month before trial. She had made from $155 to more

than $200 per week plus tips at this job. Mother testified she missed one day of work because she had a seizure and was fired. Mother does not have any job prospects. Mother testified the Plan required her to screen potential babysitters. Mother said she did that and would use Grandmother as the babysitter. All medications are out of reach of the children. Mother admitted she did not have reliable transportation. She does own a vehicle but it is not in working order. Mother admitted she never paid any child support and did not buy her children any Christmas or birthday gifts, even though she was employed for several months. She did, however, work long enough at a tattoo parlor to be able to get two piercings. Since losing her job at Waffle House, Mother has not sought employment because she does not have transportation. When asked if she could have taken care of the children if she had regained custody one week prior to trial, Mother responded "no."

Father tested positive for THC in a drug test administered the day of trial. Father did not testify at trial.

After trial, the Juvenile Court entered an Order terminating Parents' parental rights. The Juvenile Court found by clear and convincing evidence that Mother had abandoned the children by willfully failing to pay child support for the children for a period of four consecutive months preceding the filing of the petition. The Juvenile Court also found:

> That the children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of [Parents]; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to them in the near future; and the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home;

> That [Parents] have failed to comply in a substantial manner with those reasonable responsibilities set out in the foster care plans related to remedying the conditions which necessitate foster care placement;

> That it is in the best interest of [the children] … that all of [Parents'] parental rights to these children be terminated ….

Parents appeal the final judgment of the Juvenile Court. Parents assert the State failed to prove by clear and convincing evidence that there were sufficient grounds to terminate their parental rights. Parents also claim the State failed to prove by clear and convincing evidence that termination of their parental rights would be in the best interests of the children.

## Discussion

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In *State v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982)).
>
> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:
>
>> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence

standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).…

*State v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941 at **16-19 (Tenn. Ct. App. Dec. 28, 2001).

Termination of parental rights may be based upon a number of statutory grounds. The three grounds upon which the Juvenile Court based its ruling are:

(1) Abandonment by the parent or guardian, as defined in [prior law], has occurred;[3]

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

---

[3] The statutory definition of "abandonment" referenced in this statute has been declared unconstitutional. Hence, we have substituted "prior law" to reference the law which is to be applied until the statute is amended by the legislature.

(i)     The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g).

The Juvenile Court found there was clear and convincing evidence that all three of these statutory grounds for termination of Mother's parental rights had been met, and that the latter two grounds had been met as to Father. In making this determination, the Juvenile Court heard the testimony of the witnesses, including the DCS representative and Mother. "Unlike this Court, the [Juvenile Court] observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Based on our review of the record, including the facts detailed above, we do not believe the Juvenile Court committed any reversible error in reaching its conclusion that clear and convincing evidence existed to terminate Mother's and Father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii). There has been substantial noncompliance with the terms of the Plan. The proof showed Parents were unemployed and did not have transportation. Mother admitted she could not care for the children at this time. It does not appear Mother is actively looking for a job and there are no prospects on the horizon. Parents failed to maintain contact with Justis. There is no proof Father lived in a residence suitable for raising the children. Father did not remain drug free. These and other facts as previously set forth establish Parents' substantial noncompliance with the terms of the Plan. These same facts also constitute "other conditions which in all reasonable probability would cause the [children] to be subjected to further abuse or neglect and which, therefore, prevent the [children's] safe return to the care of

-8-

[Parents]." Tenn. Code Ann. §§ 36-1-113(g)(3)(A)(i). There was no proof offered at trial that these conditions would be remedied in the near future. We likewise agree with the Juvenile Court that continuation of the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home.

Because we affirm the termination of Parents' parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii), we pretermit the issue of whether the children had been abandoned by Mother for willfully failing to support them.

Having affirmed that statutory grounds for termination were proven by clear and convincing evidence, we next address Parents' claim that it was not proven by clear and convincing evidence that the termination of their parental rights was in the best interests of the children. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

> (I) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). After considering all relevant statutory factors in light of the testimony of the witnesses at trial, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence established that it was in the best interest of the children to terminate Parents' parental rights.

**Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed one-half against the Appellant S.L.G., and his surety, and one-half against the Appellant A.N.G., and her surety.

_____
D. MICHAEL SWINEY, JUDGE